**Nos. 23-1719, 23-1941, & 23-1959 (Con.)**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JULIAN OMIDI,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California
No. 2:17-cr-00661
Hon. Dolly M. Gee

## APPELLANTS' JOINT REPLY BRIEF

Lawrence S. Robbins
Jeffrey C. Fourmaux
Priyanka Wityk
FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP
7 Times Square
New York, NY 10036
212-833-1100

*Attorneys for Defendant-Appellant*
*Julian Omidi*

Elon Berk
GUROVICH BERK & ASSOCIATES
15250 Ventura Boulevard, Suite1220
Sherman Oaks, CA 91403
818-205-1555

*Attorneys for Defendant-Appellant*
*Surgery Center Management, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................2

I.    DISMISSAL, OR AT A MINIMUM A NEW TRIAL, IS WARRANTED ON MATERIALITY GROUNDS. ......................................2

    A.    Appellants Did Not Waive Their Materiality Arguments....................2

    B.    The Government Failed to Prove Materiality. ...................................3

    C.    The Impermissible "Further Investigation" Testimony Did Not Prove Materiality Either....................................................9

II.    APPELLANTS ARE ENTITLED TO A NEW TRIAL BASED ON ERRONEOUS JURY INSTRUCTIONS. ...............................10

    A.    The "Reckless Indifference" Instruction Requires Reversal..............10

    B.    The Government Constructively Amended the Indictment. ..............19

III.    APPELLANTS ARE ENTITLED TO A NEW TRIAL BASED ON ERRONEOUS EVIDENTIARY RULINGS...........................22

    A.    The Zarrabi Reports Were Inadmissible. ...........................................22

    B.    Petron's "Loss" Testimony Was Inadmissible....................................28

    C.    The Oxman Threats Were Inadmissible...............................................31

IV.    THE FORFEITURE AND RESTITUTION AWARDS SHOULD BE REVERSED. ...................................................................36

    A.    The District Court Erred in Awarding Forfeiture. ..............................36

    B.    The District Court Erred in Ordering Appellants to Pay Restitution for Sleep Studies and CPAP Equipment. ..........................39

i

CONCLUSION .................................................................................................43

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Borden v. United States*,
    593 U.S. 420 (2021)......................................................................11, 12

*Dudley v. Duckworth*,
    854 F.2d 967 (7th Cir. 1988) ..................................................................35

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ..................................................................12

*Farmer v. Brennan*,
    511 U.S. 825 (1994)..........................................................................12, 17

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)................................................................................17

*Huddleston v. United States*,
    485 U.S. 681 (1988)............................................................................9, 32

*Kungys v. United States*,
    485 U.S. 774 (1988)............................................................................9, 10

*Maslenjak v. United States*,
    582 U.S. 335 (2017)..................................................................................9

*Neder v. United States*,
    527 U.S. 1 (1999)......................................................................................6

*Puerta v. United States*,
    121 F.3d 1338 (9th Cir. 1997) ................................................................11

*Rehaif v. United States*,
    588 U.S. 225 (2019)................................................................................18

*Riley v. McDaniel*,
    786 F.3d 719 (9th Cir. 2015) ..................................................................18

*Thompson v. Runnels*,
    705 F.3d 1089 (9th Cir. 2013) ................................................................11

iii

*United Sates v. Johnson,*
297 F.3d 845 (9th Cir. 2002) .................................................................9

*United States v. Adamson,*
291 F.3d 606 (9th Cir. 2002) ...............................................................22

*United States v. Bailey,*
696 F.3d 794 (9th Cir. 2012) ...............................................................34

*United States v. Barragan,*
871 F.3d 689 (9th Cir. 2017) .................................................................2

*United States v. Bonds,*
608 F.3d 495 (9th Cir. 2010) .........................................................33, 34

*United States v. Bussell,*
414 F.3d 1048 (9th Cir. 2005) .............................................................41

*United States v. Carpenter,*
95 F.3d 773 (9th Cir. 1996) .................................................................10

*United States v. Davis,*
854 F.3d 601 (9th Cir. 2017) ...............................................................19

*United States v. De La Fuente,*
353 F.3d 766 (9th Cir. 2003) ...............................................................39

*United States v. Dearing,*
504 F.3d 897 (9th Cir. 2007) ...............................................11, 12, 13

*United States v. Depue,*
912 F.3d 1227 (9th Cir. 2019) ...............................................................2

*United States v. Gaudin,*
515 U.S. 506 (1995).............................................................................4

*United States v. Gracidas-Ulibarry,*
231 F.3d 1188 (9th Cir. 2000) .......................................................12, 13

*United States v. Heredia,*
483 F.3d 913 (9th Cir. 2007) .......................................................12, 16

iv

*United States v. Hoover*,
  467 F.3d 496 (5th Cir. 2006) .................................................................20

*United States v. Jewell*,
  532 F.2d 697 (9th Cir. 1976) .................................................................16

*United States v. Lewis*,
  67 F.3d 225 (9th Cir. 1995) ...................................................................14

*United States v. Licavoli*,
  604 F.2d 613 (9th Cir. 1979) .................................................................25

*United States v. Lindsey*,
  850 F.3d 1009 (9th Cir. 2017) .................................................................9

*United States v. Litvak*,
  808 F.3d 160 (2d Cir. 2015) ..................................................................10

*United States v. Lloyd*,
  807 F.3d 1128 (9th Cir. 2015) ...............................................16, 17, 20

*United States v. Lo*,
  839 F.3d 777 (9th Cir. 2016) .................................................................39

*United States v. Love*,
  535 F.2d 1152 (9th Cir. 1976) .........................................................20, 21

*United States v. Milheiser*,
  98 F.4th 935 (9th Cir. 2024) ..........................................................1, 6, 7, 8

*United States v. Miller*,
  953 F.3d 1095 (9th Cir. 2020) ...............................................................13

*United States v. Morgan*,
  786 F.3d 227 (2d Cir. 2015) ..................................................................35

*United States v. Nosal*,
  844 F.3d 1024 (9th Cir. 2016) ...............................................................21

*United States v. Pangelinan*,
  656 F. App'x 382 (9th Cir. 2016) ...........................................................39

v

*United States v. Polizzi*,
801 F.2d 1543 (9th Cir. 1986) ............................................................35

*United States v. Romo-Romo*,
246 F.3d 1272 (9th Cir. 2001) ............................................................18

*United States v. Rosales-Aguilar*,
818 F.3d 965 (9th Cir. 2016) ................................................................3

*United States v. Rutgard*,
116 F.3d 1270 (9th Cir. 1997) ..............................................2, 36, 37

*United States v. Scholl*,
166 F.3d 964 (9th Cir. 1999) ..............................................................25

*United States v. Shipsey*,
190 F.3d 1081 (9th Cir. 1999) ............................................................20

*United States v. Siders*,
712 F. App'x 601 (9th Cir. 2017) ........................................................25

*United States v. Stargell*,
738 F.3d 1018 (9th Cir. 2013) ..............................................................3

*United States v. Stein*,
37 F.3d 1407 (9th Cir. 1994) ..............................................................14

*United States v. Tydingco*,
909 F.3d 297 (9th Cir. 2018) ..............................................................18

*United States v. Venturella*,
585 F.3d 1013 (7th Cir. 2009) ............................................................39

*United States v. Vizcarra-Martinez*,
66 F.3d 1006 (9th Cir. 1995) ................................................................3

*United States v. Williams*,
685 F.2d 319 (9th Cir. 1982) ..............................................................16

*United States v. Yi*,
704 F.3d 800 (9th Cir. 2013) ..............................................................17

vi

*Yee v. City of Escondido*,
   503 U.S. 519 (1992) .......................................................................... 14, 15

**Statutes**

18 U.S.C. § 924(e)(2)(B)(i) ................................................................. 11

18 U.S.C. § 981(a)(2)(A) ................................................................... 37

18 U.S.C. § 3663A(a)(2) ............................................................... 40, 42

18 U.S.C. § 3663A(b)(1)(A) ............................................................... 40

18 U.S.C. § 3663A(c)(1)(B) ............................................................... 39

**Rules**

Fed. R. Crim. P. 29 ....................................................................... 2, 3

Fed. R. Crim. P. 32.2(b)(1)(A) .......................................................... 36

Fed. R. Evid. 104(b) ................................................................... 32, 33

Fed. R. Evid. 703 ......................................................................... 29

Fed. R. Evid. 801(d)(2)(C) ............................................................... 23

Fed. R. Evid. 801(d)(2)(D) ............................................................... 23

Fed. R. Evid. 803(6) ............................................................... 24, 25, 26

**Other Authorities**

Alexander M. Bickel, *The Least Dangerous Branch: The Supreme
   Court at the Bar of Politics* (1962) ................................................. 21

vii

# INTRODUCTION[1]

The government's brief only confirms that this Court should reverse.

Inexplicably, the government never offered the insurance Plans that define what claims are and aren't covered. Without the Plans, the jury had no way of determining materiality, *i.e.*, whether any alleged falsehood would naturally affect a coverage decision. The government responds—as it did at trial—that there was sufficient proof because any falsehood is material. But this Court has held that "not just any lie" constitutes fraud. For that reason, the convictions fail both for insufficient evidence of materiality and because they rest on an "overbroad" theory of fraud. *United States v. Milheiser*, 98 F.4th 935, 938, 944 (9th Cir. 2024).

Then things went from bad to worse. Faced with the withering credibility attack on its principal witness (Klasky), the government bolstered its case by diluting the mens rea standard to mere reckless indifference; constructively amended the indictment by inviting the jury to find a "complex of facts" never put before the grand jury; admitted the Zarrabi Reports as "business records" despite their lack of trustworthiness and the mental illness of their creator; offered "expert"

---

[1] Capitalized terms not otherwise defined herein are defined in Appellants' opening brief. The government's answering brief is cited as "GB," and Appellants' opening brief as "AB."

testimony derived from the untrustworthy Zarrabi Reports; and admitted three serious allegations of witness tampering made by a non-party (not by Appellants).

In all events, the forfeiture and restitution awards are unsustainable. The government cannot justify forfeiture of every dollar in SCM's bank accounts on the spurious premise, rejected by this Court in *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997), that SCM's business was "permeated with fraud." And the government collected millions more in restitution on behalf of insurance companies that don't even count as victims under the MVRA.

## ARGUMENT

## I.    DISMISSAL, OR AT A MINIMUM A NEW TRIAL, IS WARRANTED ON MATERIALITY GROUNDS.

### A.    Appellants Did Not Waive Their Materiality Arguments.

The government urges plain error review because the defense did not renew its Rule 29 objection at the close of all evidence.[2]  GB-26-27.  But this Court has repeatedly held that "[w]here a defendant moves for acquittal at the close of the government's evidence, [the Court reviews] *de novo* whether sufficient evidence exists to support a guilty verdict."  *United States v. Barragan*, 871 F.3d 689, 705

_____

[2] The government also advances the even bolder position that this Court may not even review Appellants' materiality challenge.  GB-27 n.8.  But *United States v. Depue*, 912 F.3d 1227, 1231-32 (9th Cir. 2019) (en banc), on which the government relies, did not involve a sufficiency challenge at all.

2

(9th Cir. 2017); *accord United States v. Rosales-Aguilar*, 818 F.3d 965, 970-71

(9th Cir. 2016); *United States v. Stargell*, 738 F.3d 1018, 1022 (9th Cir. 2013).

This rule makes good sense, especially under the facts here. By the close of

the government's case, the prosecution had failed to introduce the insurance Plans

governing coverage. AB-20-24. The defense moved for Rule 29 acquittal at that

time, but the motion was denied. 2-ER-394; 47-ER-9277-86. By the close of *all*

the evidence, the record remained unchanged on this issue: No Plans were

introduced during the defense case. There is no reason to suppose that the district

court would have ruled differently at that point. To the contrary, when the defense

called attention to the absence of Plan evidence in challenging restitution, the trial

court gave the issue the back of the hand. 1-ER-21.

In any event, because this Court would be "reluctant to affirm a conviction

… if the record clearly showed that the evidence was insufficient," there is no

practical difference between plain error and *de novo* review in this context. *United

States v. Vizcarra-Martinez*, 66 F.3d 1006, 1010 (9th Cir. 1995).

## B.     The Government Failed to Prove Materiality.

Critically, with one possible exception, the government failed to introduce

the Plans, which dictate which claims are covered. AB-10-11.[3] The government

---

[3] The single document the government did introduce showed that patient J.C.'s
claim for CPAP equipment would have been approved, notwithstanding any

3

now acknowledges that dereliction and concedes that "**an insurer looks to the plan for whether a specific procedure is covered**." GB-29 (emphasis added).[4] Without the Plans in evidence, the jury had no way of knowing beyond a reasonable doubt whether any false statements submitted to insurance companies had a "natural tendency to influence, or [was] capable of influencing" the decision that a claim was covered. *United States v. Gaudin*, 515 U.S. 506, 509 (1995).

The government speculates that none of the (unadmitted) Plans permitted claimants to submit false information. GB-24-25. While no Plan is likely to say "lying is okay with us," for materiality purposes the relevant question is whether the true facts, if disclosed, would naturally affect *the coverage decision*. *See Gaudin*, 515 U.S. at 512 ("Deciding whether a statement is 'material' requires the determination of ... [the] question[] ... 'what decision was the agency trying to make?'"). And *that* question—the only one that matters here—depends on what the controlling Plans provide.

Indeed, the government's lead Materiality Witness, Carl Reinhardt, from Anthem, testified on direct that a false statement would *not* necessarily affect a

---

falsehoods in the sleep study report. AB-22-23. The government's only response is that Dr. Zarrabi had not reviewed the prescription for the CPAP equipment. GB-32. But the record is, in fact, silent on the point.

[4] Numerous insurer witnesses likewise testified that determining whether a claim was covered required review of the individual Plans. AB-10-11.

4

coverage decision. As he explained, Lap-Band surgeries would be approved for patients with a qualifying comorbidity "[e]ven if there was a comorbidity," such as sleep apnea, that had been falsified. 10-ER-2048-49. The answer, as always, depended on what the Plan provides.

Imagine, for example, that an insurer receives a claim for Lap-Band surgery, and the patient's BMI is reported to be 41. The insurer later learns the patient's BMI is actually 40. The insurer denies the claim because of the false information. The patient's Plan, however, provides that patients with a BMI of 40 or over qualify for Lap-Band surgery. An appeal based on the Plan would likely succeed, as such appeals routinely do. 46-ER-9256-57. It cannot be that the *erroneous* decision to disapprove coverage resolves the materiality question.[5]

The government offers three responses, the first of which is virtually a confession of error. Our materiality challenge, the government says, "incorrectly assumes that coverage and medical necessity are the *only* determinants in whether to pay a claim." GB-33 (emphasis added). So, the government contends, even if one cannot determine coverage and medical necessity without admitting the Plans, there is some *other* basis for finding a false statement to be material.

---

[5] The government suggests that "certain claimed services" were not provided (GB-31), but its cited evidence, 30-ER-6022-24, suggests only that for a time Dr. Zarrabi was not paid, not that sleep studies were not actually performed.

But what else determines a coverage decision and allows a claim for a covered and medically necessary procedure to be properly denied? The answer, says the government, is that the claim "must be premised be premised on *accurate information*" (GB-20, 29), and therefore falsehoods "were material to insurers *because they were false*" (GB-39) (emphases added). That answer is profoundly mistaken on multiple levels.

To begin with, the record flatly refutes the government's claim that the presence of any false statement warrants the denial of an otherwise covered claim. 10-ER-2048-49. And the implications of the government's contention are cynical indeed: The government evidently believes, wrongly, that insurers may refuse to pay a medically necessary, covered claim simply because they are offended by any falsehood somewhere in the submission. That cannot be correct, because unless the falsehood had a natural tendency to cause an insurer to pay a claim it wasn't contractually obligated to pay, the insurer wasn't defrauded. *See Milheiser*, 98 F.4th at 942 (object of fraud scheme must be to wrongfully deprive person of money or property). Indeed, if it were true that falsehoods "were material to insurers because they were false" (GB-39), then *every* false statement to an insurer would be material, thereby rendering materiality superfluous, contrary to *Neder v. United States*, 527 U.S. 1, 25 (1999).

6

What's more, this Court's recent decision in *Milheiser* squarely rejected the government's view that any deprivation of "*accurate information* … constitutes fraud." 98 F.4th at 942 (emphasis added). To the contrary, this Court recognized that "not just any lie" constitutes fraud. *Id.* at 944. Rather, to constitute fraud a falsehood must "go to the nature of the bargain," such as "price or quality, or other[] … essential aspects of the transaction." *Id*. Thus, if a defendant's "'untruths do not deprive the [alleged victim] of the benefit of its bargain,'" the victim has not been defrauded. *Id*. (citation omitted).

The jury here could not know whether any falsehoods were even capable of depriving an insurer of the "benefit of its bargain" (*i.e.*, causing payment of a claim that wasn't covered) because the government failed to introduce the Plans that actually embodied the bargain. Appellants also requested an instruction that "false statements need to misrepresent an essential element of the bargain" (2-ER-455-56, 459, 463, 465), but, as in *Milheiser*, 98 F.4th at 945, the district court erroneously refused to give that instruction (2-ER-366, 368-69). Under *Milheiser*, the government thus not only failed to prove materiality but also presented the jury an "overbroad" and "legally invalid" theory of fraud. *Id*. at 942, 945.

Second, the government says that Appellants suggest "the government had to prove the insurers *relied* on the sleep-study misrepresentations." GB-33 (emphasis added). Not so. While materiality does not require proof of reliance, it

7

*does* require proof that the alleged falsity had a natural tendency to cause an erroneous coverage decision. Without the Plans, there was no way to tell.

Third, the government asserts (GB-34) that our argument presupposes that SCM was telling the truth about co-morbidities other than sleep apnea that established coverage. But that inverts the burden of proof. The government had the duty to prove materiality beyond a reasonable doubt. Its own lead Materiality Witness bluntly testified that patients with another qualifying co-morbidity would be covered even if their sleep study results had been falsified. 10-ER-2048-49. It thus fell to the government to prove that the other qualifying co-morbidities were falsified too. It was not Appellants' burden to prove that they weren't.

As a fallback, the government repeatedly asserts that its failure to offer the Plans affects only the subset of patients insured under employer plans, and not under insurer-provided plans. GB-20, 29, 35. Not so. Whether a patient is insured through an employer *or* through a contract with an insurer itself, there is still a Plan that controls whether a claim is covered and thus establishes the "nature of the bargain." 10-ER-2072-73, 2119-20; 14-ER-2853-54; 41-ER-8256; 45-ER-9050:8-11. Without that Plan, no one, including the Materiality Witnesses could tell whether a given claim was covered. *Id.*

8

## C. The Impermissible "Further Investigation" Testimony Did Not Prove Materiality Either.

Without the Plans, the Materiality Witnesses were unable to say that any particular alleged falsehood would naturally have affected the coverage decision. So, they hedged. They added the qualifier that "at a minimum," a falsehood would have prompted the insurers to "investigate[]" *whether* a claim should be paid anyway. GB-25, 28. But per *Kungys v. United States*, 485 U.S. 774 (1988), misrepresentations are material only if the actual facts were "such as gave cause to believe that the applicant was not qualified," *id.* at 774 n.9 (Scalia, J., joined by Rehnquist, C.J. and Brennan, J.), or the statement "concealed a disqualifying fact," *id.* at 789 (Stevens, J., joined by Marshall and Blackmun, JJ., concurring in the judgment). *Accord Maslenjak v. United States*, 582 U.S. 335, 351 (2017). Investigations alone do not make a falsehood material.

The government insists that *Kungys* applies only in naturalization cases. GB-37. Wrong. *Kungys* borrowed its materiality standard from criminal cases, concluding there is no reason to adopt "a different standard." 485 U.S. at 770 (opinion of the Court); *see also id.* at 771 ("[T]here is no less need for precision in the criminal context than in the denaturalization context."). And this Court has routinely applied *Kungys* in non-immigration criminal cases. *See, e.g.*, *United States v. Lindsey*, 850 F.3d 1009, 1011-12 (9th Cir. 2017) (wire fraud); *United*

9

*Sates v. Johnson*, 297 F.3d 845, 866 & n.20 (9th Cir. 2002) (mail and wire fraud);

*United States v. Carpenter*, 95 F.3d 773, 776-77 (9th Cir. 1996) (mail fraud).

The government failed to carry its *Kungys* burden. The government did not

show that an investigation would have caused the insurers to uncover a

disqualifying truth. *See Kungys*, 485 U.S. at 774 n.9, 789. Without the Plans, it is

impossible to know whether any particular claim was covered, and thus whether

"an investigation" would likely result in a denial of coverage.[6] Accordingly, all

charges must be dismissed for want of sufficient proof.

## II. APPELLANTS ARE ENTITLED TO A NEW TRIAL BASED ON ERRONEOUS JURY INSTRUCTIONS.

### A. The "Reckless Indifference" Instruction Requires Reversal.

Instruction 34 authorized the jury to find *both* knowledge and intent to

defraud if it concluded that Omidi was "recklessly indifferent" to the truth of

insurance claims submitted by Klasky and Hong. The government defends that

instruction, but to no avail.[7]

---

[6] The Second Circuit made precisely that point in finding insufficient materiality evidence in *United States v. Litvak*, holding that referral for an investigation has no "bearing on the materiality of" the charged false statements. 808 F.3d 160, 173-74 (2d Cir. 2015). The government's account of *Litvak* (GB-38) omits this crucial holding.

[7] The government contends that the "sole preserved objection" to Instruction 34 was that "recklessness" wasn't defined. GB-42. But as the government elsewhere acknowledges (GB-40), before the jury was charged, Appellants objected that recklessness does not prove both intent and knowledge. *See* 2-ER-485 (objecting

10

*Intent to defraud.* The very notion of "intent to defraud" presupposes a *purposeful* state of mind. AB-29. The government does not contest the point, but invokes *United States v. Dearing*, 504 F.3d 897 (9th Cir. 2007). For several reasons, *Dearing* is no longer good law (if it ever was).

First, it is impossible to square *Dearing* with the much more recent plurality decision in *Borden v. United States*, 593 U.S. 420, 423 (2021). The question in *Borden* was whether a crime requiring only recklessness could be an Armed Career Criminal Act ("ACCA") predicate. *Id.* Under the statute, a predicate must involve "the use, attempted use, or threatened use of physical force *against the person of another*." 18 U.S.C. § 924(e)(2)(B)(i) (emphasis added). The plurality "beg[a]n by setting out four states of mind … that may give rise to criminal liability. Those mental states are, in descending order of culpability: purpose, knowledge, recklessness, and negligence." *Borden*, 593 U.S. at 425-26. "Purpose and knowledge," the plurality observed, "are the most culpable levels in the criminal law's mental-state 'hierarchy.'" *Id.* at 426. "Recklessness and negligence," by contrast, "are less culpable mental states." *Id.* at 427. And crimes requiring only

---

to the instruction which was then numbered "53"); 47-ER-9332-36 (objecting to the instruction which was then numbered "32"). Moreover, "parties are not limited to the precise arguments they made below," *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013), and "there is nothing wrong" with citing additional authority on appeal, *Puerta v. United States*, 121 F.3d 1338, 1341-42 (9th Cir. 1997).

11

such "less culpable mental states" cannot qualify as ACCA predicates because ACCA covers only offenses "against the person of another"—and one cannot act "against the person of another" unless he has the "purpose or knowledge" that his acts will harm some other person. *Id.* at 429. Recklessness falls short. *See id.*

Even more so with "intent to defraud." To harbor such an intent, a perpetrator must have "fraud" as his purpose. Indeed, prior to (but ignored by) the panel decision in *Dearing*, this Court sitting en banc held that "specific intent" crimes—which include mail and wire fraud, *see Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014)—correspond to crimes of "purpose" in the Model Penal Code hierarchy and require the defendant to "consciously desire" the result prohibited by the statute. *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000) (en banc). Recklessness, however, entails no such purpose or conscious desire under *Farmer v. Brennan*'s controlling definition. *See* 511 U.S. 825, 839 (1994).

Nor can *Dearing* be squared with the subsequent en banc decision in *United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc). Reaffirming the legitimacy of willful blindness as a means of proving (mere) knowledge, the en banc Court emphasized that "negligence or recklessness" would not suffice. *Id.* at 918 n.4. Recklessness cannot prove *intent to defraud* if it doesn't even prove knowing conduct (which is lower than "purpose" on the mens rea hierarchy).

12

And there is still more quicksand around *Dearing*. Consistent with Ninth Circuit practice at the time, the *Dearing* jury was instructed that "intent to defraud" required proof that the defendant had "the specific intent to deceive *or* cheat." 504 F.3d at 902 (emphasis added). Either option—an intent "to deceive" *or* an intent to "cheat"—would suffice. But this Court put an end to that dichotomy in *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020), holding that wire fraud requires proof that the defendant intended *both* to deceive the victim *and* to cheat him out of money or property. Even *actual* knowledge of falsity is insufficient to prove an intent *to cheat* out of money or property, much less is mere reckless indifference to truth or falsity. AB-30-31.[8]

We agree that jury instructions must "be viewed as a whole." GB-42. But that principle is cold comfort to the government's position. Untethered to any other instruction, Instruction 34 gave the jury an alternative (and much easier) path to conviction. The jury could either try to determine what Omidi actually knew

---

[8] The government contends that a panel decision like *Miller* cannot displace circuit precedent. GB-46. But *Miller expressly* overruled Ninth Circuit precedent to the extent that it approved a disjunctive instruction on intent to defraud. 953 F.3d at 1103. And the notion that reckless indifference may alone prove both intent to deceive and intent to cheat cannot be reconciled with *Miller*. What's more, a panel is *especially* powerless to depart from an *earlier en banc* decision. But *Dearing* itself suffers from precisely that frailty, having ignored the Court's 2000 en banc decision in *Gracidas-Ulibarry*, *see supra* p. 12.

and intended—or it could simply skip ahead to a guilty verdict if it found that he was recklessly indifferent to whether false claims were being submitted. *See United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994) (reversing money laundering conviction because conflicting instructions allowed jury to convict defendant without proving every element of offense); *United States v. Lewis*, 67 F.3d 225, 233-34 (9th Cir. 1995) (reversing wire fraud conviction because "court cannot presume that the jury followed" correct instructions rather than erroneous ones).

*Knowledge*. Reckless indifference also falls short of proving knowledge. The government mistakenly contends (GB-41-42) that this claim is subject to plain error review because (supposedly) the defense objected to Instruction 34 only on the ground that recklessness fails to prove intent to defraud.

The government's waiver argument slices the onion too thinly. The defense asked the district court to strike the last sentence of Instruction 34 in its entirety. Our present argument, that the last sentence falls far short of charging willful blindness, is simply a "separate *argument*[] in support of a single claim," *Yee v. City of Escondido*, 503 U.S. 519, 535 (1992), that the final sentence of Instruction 34 should have been struck. AB-32-35.

In any event, the defense did sufficiently preserve the knowledge prong of its attack on Instruction 34. When the district court proposed adding that

14

instruction, the defense objected that it would be "duplicative, unnecessary, and, as written, incorrect." 47-ER-9332. The defense explained that the willful blindness instruction (33) already accurately covered the knowledge issue, and that including the final sentence of Instruction 34 would just confuse matters. *Id.*[9]

In substance, that remains our argument. We have no quarrel with the content of the willful blindness instruction (apart from the fact that it constructively amended the indictment). After all, the willful blindness instruction permitted the jury to find knowledge only if it concluded that the defendant was "aware of a high probability that, for example, false or misleading representations were made to insurers or that fraudulent claims were being submitted, and … deliberately avoided learning the truth." 2-ER-377. But in the very next breath, the district court diluted that concept to "reckless indifference" (which it declined to define). So instructed, the jury now had three paths to finding knowledge: actual knowledge (the only theory charged in the indictment); willful blindness (an uncharged theory, but at least accurately framed in Instruction 33); and reckless indifference (uncharged, undefined, and legally incorrect).[10]

---

[9] At the time, the willful blindness instruction was numbered "31," and the offending instruction was numbered "32." 47-ER-9332-34.

[10] Although we therefore submit that Instruction 34 is subject to de novo review, an error as basic as this, and as clearly precluded by then-settled en banc decisions of this Court, readily meets the "plain error" standard of review.

15

On the merits, the government relies almost exclusively on this Court's decision in *Lloyd* (GB-48-49), but to no avail. The Court emphasized in *Lloyd* that the challenged instruction required the jury to find not only reckless indifference, but also "an intent to deceive." 807 F.3d at 1164. Instruction 34, by contrast, contained no such constraint.

The government's reading of *Lloyd*—according to which reckless indifference, standing alone, proves knowledge—also contravenes at least two en banc decisions of this Court, which held that mere recklessness does *not* prove knowledge. *United States v. Jewell*, 532 F.2d 697, 704 n.21 (9th Cir. 1976) (en banc); *Heredia*, 483 F.3d at 923-24 (cautioning that a willful blindness instruction must never devolve "to something akin to recklessness or negligence."). "Recklessness or negligence," the en banc Court said in *Heredia*, "never comes into play." *Id.* at 924.

But recklessness "c[a]me into play"—indeed, it took center stage—in Instruction 34. That was just plain wrong. As this Court held in *United States v. Williams*, 685 F.2d 319, 321 (9th Cir. 1982), in language equally dispositive here: "Although conscious avoidance of the truth may constitute knowing conduct, *reckless conduct alone is not sufficient*" (emphasis added). Instruction 34 told the jury the polar opposite.

16

The government does not even try to square Instruction 34 with the Supreme Court's decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011). The Court held in *Global-Tech* that willful blindness requires the government to prove that the defendant took "*deliberate* actions to avoid learning" the truth. *Id.* at 769 & n.9 (emphasis added). That "deliberate action" requirement, the Court explained, "gives willful blindness an appropriately limited scope that *surpasses recklessness and negligence,*" and thus suffices to establish knowledge. *Id.* at 769-70 (emphasis added).

Nor does the government address *United States v. Yi*, 704 F.3d 800 (9th Cir. 2013), where this Court, applying *Global-Tech*, sustained a willful blindness instruction precisely because it left "little reason to suspect that juries will import recklessness or negligence concepts … into their deliberations." *Id.* at 804-05.

The government's remaining two arguments are make-weight. It first contends (GB-50-51) that *Lloyd* permits a prosecutor to submit "recklessness" to the jury without a definition; but it fails to explain why a *Supreme Court* decision, *Farmer v. Brennan*—which expressly recognized that "the term recklessness is not self-defining" and may mean as little as "gross negligence" to the jury—does not take precedence. 511 U.S. 825, 836-37 & n.4 (1970).

As for harmless error (GB-51-53), the government comes nowhere close to showing that the "reckless indifference" instruction was "harmless beyond a

17

reasonable doubt." *United States v. Romo-Romo*, 246 F.3d 1272, 1274 (9th Cir. 2001). Instead, the government simply claims that, because evidence of actual knowledge was (supposedly) "overwhelming," it must have carried its burden. GB-51. The evidence was not "overwhelming." AB-12-15. And that is not the standard. *See Romo-Romo*, 246 F.3d at 1274; *Riley v. McDaniel*, 786 F.3d 719, 725-26 (9th Cir. 2015) (where jury received erroneous instruction, simply "showing that evidence exists which could rationally be viewed" as supporting conviction is "not enough to establish" harmless error). The government offers no response to our showing (AB-37-38) that it significantly relied on the "reckless indifference" path to conviction at trial and in summation. Nor does it explain how an error this fundamental, on the issue of mens rea (which typically separates civil from criminal responsibility, *see Rehaif v. United States*, 588 U.S. 225, 231 (2019)), could be disregarded as harmless.[11] *See United States v. Tydingco*, 909 F.3d 297, 306 (9th Cir. 2018) (reversing conviction on plain error review where jury might have relied on "legally invalid theory").

---

[11] In its capacity as mind-reader, the government asks the Court to infer from the jury's decision to acquit Dr. Zarrabi that "the jury grasped the requisite mens rea." GB-52-53. We do not pretend to such clairvoyance.

### B.    The Government Constructively Amended the Indictment.

The government all but concedes (GB-55) that the indictment alleged *only* that Omidi had personally directed every aspect of the purported scheme and therefore had actual knowledge.  *See* AB-39-40 (detailing the allegations of actual knowledge incorporated in every count).  Those allegations are inconsistent with the "complex of facts" advanced at trial—but never found by the grand jury—that Omidi was only recklessly indifferent to the fraud of others or consciously avoided learning of their fraud.

The government asserts that so long as the instructions provided an alternative way of proving mens rea for the *same* crimes charged in the indictment, there cannot be a constructive amendment.  GB-57.  But that is the very definition of a constructive amendment.  In *United States v. Davis*, 854 F.3d 601, 604 (9th Cir. 2017), the indictment charged that the defendant knew or recklessly disregarded that the victim was underage.  This Court found a constructive amendment because the trial court gave the jury a third option, permitted by the statute but not charged in the indictment:  that culpability could also be found if the defendant "had a reasonable opportunity to observe" the victim.  *See id.* at 604-05.  This alternate path for proving mens rea, said the Court, constructively amended the indictment because it was "impossible to know whether the grand jury would have indicted for the crime actually proved."  *Id.* at 605.

19

So too here—we cannot know whether the grand jury, presented only with the single theory specified in the FSI, would have indicted under the alternate theories offered at trial. *See United States v. Hoover*, 467 F.3d 496, 502 (5th Cir. 2006) (where "government chooses to specifically charge the manner" in which crime committed, it "should be required to prove" that manner); *United States v. Shipsey*, 190 F.3d 1081, 1087 (9th Cir. 1999) (where indictment's "statement of facts and circumstances" alleged only theft by fraudulent pretense and was incorporated into every count, the district court was required to limit its instructions to that single theory).

As in *Shipsey*, the FSI here incorporated its statement of facts into every count of the indictment. *See* FSI [2-ER-514], at 1 & ¶¶ 38, 44, 46, 48, 50, 56. That statement contained not a whisper that Omidi consciously avoided learning of (or was recklessly indifferent to) Klasky and Hong's actions, and instead alleged *only* that Omidi personally "instructed," "directed," and "authorized" every step they took. Nevertheless, as the government is constrained to admit, it introduced a "distinctly different" "complex of facts" at trial (supported by the erroneous Instruction 34) inviting the jury to find mens rea on these uncharged grounds. *See* GB-56 (itemizing "ample" evidence of "red flags" Omidi supposedly ignored).[12]

---

[12] The government's reliance on *Lloyd* and *Love* (GB-58-59) is misplaced. *Lloyd* did not involve an indictment that set out but a single legal theory from which the

20

As for the government's speculation that "there is no doubt that the grand jury would have … indict[ed] defendants" on the mens rea standards proposed by Instructions 33 and 34 (GB-61), that is a total non-starter. The government is not free to imagine what a grand jury might have done; it is constrained by what the grand jury *actually did*. *Nosal* lends the government no support here, as it did *not* hold that "'knowingly' subsumes deliberate ignorance and reckless indifference" (GB-57, 61). *Nosal* held only that a grand jury that found a defendant "knowingly" stole trade secrets, necessarily would have found the defendant "firmly believed" he was stealing trade secrets. 844 F.3d at 1044-45.

Finally, the government contends that, because it supposedly *proved* actual knowledge at trial, and *charged* actual knowledge in the indictment, there cannot be a constructive amendment. GB-55. But "[n]o answer is what the wrong question begets." Alexander M. Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar of Politics* 103 (1962). The right question is *not* whether the prosecution introduced evidence that matched the indictment's "complex of

---

jury was invited at trial to depart. AB-44 n.8. *Love* pre-dated *Shipsey*'s teaching that when an indictment incorporates its statement of facts into every count, it limits the government to proving that theory at trial (*see supra* p. 20). *Love* instead concluded the at-issue knowledge allegations in the indictment were mere "surplusage," 535 F.2d at 1158, whereas the government does not suggest that the same holds true for the indictment here.

21

facts"; it is, instead, whether the prosecution *also* offered an *alternative* "complex of facts" on which the trial jury could have convicted, but which the grand jury *never* found. It plainly did. AB-37-38. Because there was a constructive amendment, reversal is required. *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002).

Alternatively, if the Court finds that there was not a constructive amendment, there was a variance because the proof at trial was materially different from the proof presented to the grand jury. AB-45-46. Contrary to the government's contention (GB-62 n.13), Klasky's testimony to the grand jury was sharply inconsistent with his trial testimony that Omidi deliberately avoided looking at his spreadsheet (*see* AB-45 & n.9). Nor was any prejudice remedied by the instruction that Appellants were not on trial for conduct not charged in the indictment (GB-63-64), because the indictment was not provided to the jury (FER-5:3-6). Omidi's conviction should be reversed because the alternative evidence offered at trial bore on mens rea and affected Omidi's substantial rights.

## III. APPELLANTS ARE ENTITLED TO A NEW TRIAL BASED ON ERRONEOUS EVIDENTIARY RULINGS.

### A. The Zarrabi Reports Were Inadmissible.

The AHI reports drafted by Michael Zarrabi were the centerpiece of the government's case. By juxtaposing the Zarrabi Reports (supposedly the "true" AHI numbers) with the generally higher Klasky AHI submissions, the government

22

told the jury, again and again and again, *see, e.g.*, 21-ER-4522-25; 22-ER-4556-57; 36-ER-7182-85, 7197-98; 39-ER-7841-43; 46-ER-9206-07; 59-ER-12218, 12464, that the differential was the measure of Omidi's fraud.

The admission of the Zarrabi Reports was deeply mistaken. For one thing, they were only *drafts*, which would thereafter be reviewed and revised by his brother, Dr. Zarrabi. *See* 29-ER-5756-58, 5789-93; FER-13-15. Dr. Zarrabi's final reports were stored on an FTP site, 4-ER-908; 35-ER-6987-88, but the government inexplicably failed to serve a preservation notice or subpoena on the company hosting the site, and Dr. Zarrabi's reports were destroyed. 48-ER-9626-28. There is no way to tell whether the drafts bore any relationship to the final diagnoses.

Even so, the government opted to offer the draft Zarrabi Reports for their truth and now defends their admission on two grounds. First, the government claims the reports are "party admissions." GB-68-69. But there is no evidence—none—that Omidi "authorized" Michael Zarrabi to speak for him (Fed. R. Evid. 801(d)(2)(C)) or otherwise to act as his "agent or employee" (Fed. R. Evid. 801(d)(2)(D)). Michael Zarrabi wasn't SCM's agent or employee either; he was an independent contractor for IMS, which, having been severed, was not on trial. *See* FER-6-10; GB-12 n.3.

23

Second, the government argues that the Zarrabi Reports are business records, but they flunk every prerequisite under Rule 803(6). Start with the requirement that business records be made by "a person with knowledge based on their observations." Michael Zarrabi, the "maker of the documents," was seriously mentally ill when he worked at IMS. He confessed to using his "imagination" to create some of these reports. 4-ER-889. Unsurprisingly, the government chose not to call him at trial.

All the government can muster in response is that "the record is far from clear that Michael Zarrabi's work was affected by any purported conditions." GB-71 n.15. In essence, the government, charged with the burden of proof, throws up its hands and says, "Who knows?"

But perhaps the central failing in the government's response is its utter failure to reckon with the untrustworthiness of the Zarrabi Reports. Here, the government offers two defenses, neither of which holds water.

Like the district court (41-ER-8323-24), it first contends that, so long as the Zarrabi Reports were regularly created in the course of business, they are not

24

subject to a trustworthiness inquiry.[13]  In effect, the government proposes to read

subsection (E) out of Rule 803(6).

The government next contends that "[i]n any event, the reports were

generally reliable."  GB-73.  But it has little to say about our central reliability

challenge:  that the Zarrabi Reports were only as good as the raw data (*i.e.*, the

"source of information") they purported to interpret.  And the raw data, as virtually

every government witness agreed, was practically worthless.  The sleep

technicians, Klasky said, "didn't know how to do their jobs."  31-ER-6257-58.  Dr.

Kline, a government witness and sleep study specialist at SCM, found the raw data

"very poor," "frustrating to look at," and "lacked credibility."  9-ER-1823.  Even

---

[13] The government's citations (GB-72) are sharply distinguishable.  In *United States v. Scholl*, 166 F.3d 964, 978-79 (9th Cir. 1999), the issue was whether the defendant had "substantial[ly]" understated the wagers he had reported.  Because the exact accuracy of the gambling records was immaterial so long as they showed a "substantial" understatement, the Court sustained their admission despite their being "merely estimates."  *Id.*  But here, the Zarrabi Reports were admitted as the patient's exact, true diagnosis.  22-ER-4557; 46-ER-9122-23.  In *United States v. Siders*, 712 F. App'x 601, 603 (9th Cir. 2017), the government had offered the documents at issue *for their falsity*, not for their truth, and thus Rule 803(6) was immaterial.  And in *United States v. Licavoli*, 604 F.2d 613 (9th Cir. 1979), the defendant did not contest that Rule 803(6) was satisfied but sought to impose an additional prerequisite:  that the witness who sponsored the document be qualified as an expert if the document contained expert opinion.  *Id.* at 622.  The Court declined to adopt that requirement.  *Id.* at 622-23.  The Court expressly noted, however, that the rule permits exclusion of business records "if the source of information indicates a lack of trustworthiness."  *Id.* at 622.

25

the government acknowledges that "the poor quality of collected data" "may have hampered Michael Zarrabi's ability to score."  GB-74-75.  Indeed, there were 180 instances where Michael Zarrabi recorded gaps in breathing that no human could accomplish, lasting as much as *85 minutes*.  AB-53.  He also recorded BMI figures that would require a patient to weigh over 50,000 pounds.  AB-53 n.12.

The government insists, however, that the poor quality of the underlying data "was a product of Get Thin's business practices," and so should not bear on admissibility.  GB-74.  But there's no "fault" exception to Rule 803(6)(E)—if reports flunk the trustworthiness test, they don't come in as business records, regardless of whose fault it was that they were untrustworthy.  Because Rule 803(6) imposes an independent trustworthiness check on the admission of business records, the fact that incompetent persons (supervised by Klasky, not Omidi) generated the "source of" Michael Zarrabi's "information" does not entitle the government to parade the final product before the jury and call it "true."

"The circumstances of preparation" are just as dubious.  In the face of the overwhelming evidence of Michael Zarrabi's incompetence (AB-53), the government offers only the most anemic response.  Dr. Kline, the government notes, "received" some of Zarrabi Reports and "corresponded" with Michael Zarrabi about the scores.  GB-66.  But the government neglects to mention what Dr. Kline *concluded* about those reports:  Michael Zarrabi had "missed some pretty

26

obvious apneas" and his AHI results were often too low as a result (9-ER-1831-32; 59-ER-12125); much of the raw data was impossible to score, even though Michael Zarrabi professed to have scored that data (46-ER-9163-64); and Michael Zarrabi had inexplicably "cut in half" a patient's actual AHI (9-ER-1925-26). While some of Dr. Kline's diagnoses may have been "consistent" with Michael Zarrabi's (GB-73-74), that assertion elides the fact that in most cases Kline could not make *any* diagnosis because the raw data was unscorable—even though Michael Zarrabi purported to have scored it. The government produced no witness to explain how Michael Zarrabi was able to score unscorable data.

The government also trots out its expert, Dr. Norman, and asserts that "*[t]o the extent Dr. Norman was able to score studies for the same patients* [as Michael Zarrabi]," his scoring was "more consistent" with Michael Zarrabi's scoring than with the AHI scores submitted to insurers. GB-74 (emphasis added). Talk about faint praise. In fact, of all the files on Michael Zarrabi's hard drive, Norman found that only 56 had readable data, and he had been able to review and score only about 24. 15-ER-3210-12. Nonetheless, the government was authorized to present data from *hundreds* of Zarrabi Reports at trial. 60-ER-12588-613; 61-ER-12624-879; 62-ER-12885-13036.

As a last resort, the government invokes harmless error, which is truly preposterous. GB-75-76. The government asserts that "defendants did not

27

*meaningfully* dispute that studies were falsified" but relied *meaningfully* only on a mens rea defense. GB-76 (emphasis added). Whether Appellants "meaningfully" disputed the falsity of the studies is irrelevant. Absent a stipulation, the government bore the burden of proving falsity of the submissions beyond a reasonable doubt. And a comparison of the Zarrabi Reports with insurer submissions is how they chose to do it. Only by passing those reports off as "true" could the government contend, as it did to a fare-thee-well, 46-ER-9169, that as little as a 1-point deviation from Michael Zarrabi's AHI numbers constituted a fraudulent statement.

### B. Petron's "Loss" Testimony Was Inadmissible.

Petron's testimony was an egregious instance of "garbage in, garbage out."

First and foremost, Petron's loss calculations presupposed that the Zarrabi Reports accurately reflected patients' sleep apnea levels (such that even a 1-point departure was "fraudulent"). But the Zarrabi Reports' scores are no more likely to be true than lotto numbers drawn from a tumbler. AB-51-55; *supra* pp. 24-27. Nor, despite the government's misleading quotation (GB-82 (quoting 42-ER-8508)), did the district court find otherwise. To the contrary, the court observed that the reports "may not always have been done properly" but would be admitted nonetheless because Michael Zarrabi "was the only scorer … hired by the company." 42-ER-8508.

28

"Not to worry," says the government; even if inadmissible, Petron could still rely on the Zarrabi Reports under Fed. R. Evid. 703.  But Rule 703 permits experts to rely on such data *only* if "experts in the particular field would reasonably" do so in forming similar opinions.  And there is nothing "reasonable" about treating as *true* a set of AHI results that were plucked from thin air or based on corrupt data.  AB-48-49, 51-55.  Nor can one surmise that experts would generally rely on the Zarrabi Reports when Petron himself was simply *instructed by the government* to base his analysis on the Zarrabi Reports.  AB-58-59.

Petron also accepted at face value the government's instruction to treat even a 1-point differential between the Michael Zarrabi AHI and the submitted AHI as establishing a cognizable loss.  46-ER-9169, 9209-10; 59-ER-12218.  The government dismisses as "speculation" (GB-82-83) our contention that such a 1-point differential did not necessarily cause Plan providers to pay claims that weren't otherwise covered.  But Carl Reinhardt, the government's principal Materiality Witness explained in response to the prosecution's own questions that a falsified sleep apnea diagnosis would not mean that there was no coverage if there was another qualifying comorbidity:

> Q: So is it possible that a patient may have, in fact, a comorbidity that exists, that Anthem would then approve the lap band surgery for?
>
> A. Yes.

29

Q. Even if there was a comorbidity that was falsified?

A. Yes.

10-ER-2049. Petron, however, was not asked to consider other qualifying co-morbidities in determining loss.

As for the government's instruction that Petron count as fraudulent any claim for which prosecutors could not locate an approval email from Dr. Zarrabi, the government has next to nothing to say. It does not dispute that the absence of an email might simply result from its own failure to locate the email. AB-60. It does not dispute that Dr. Zarrabi could have provided feedback in ways other than emails. And the government's final *ipse dixit*—that the insurers would not have paid claims missing a Dr. Zarrabi approval email—again overlooks the most basic flaw in the entire prosecution case: Even a bogus AHI result would not foreclose reimbursement, if the patient was otherwise qualified, such as by having a BMI of 40 or above. 10-ER-1996, 2049. Indeed, it is precisely on that basis that the district court, when given a chance to draw its own "loss" determinations at sentencing, flatly rejected Petron's results and concluded that the government had failed to show anything close to Petron's loss numbers. 1-ER-157.

So much for Petron's "methodology." But it gets worse for the government. How was Petron's testimony relevant in the first place? Relying on two out-of-circuit cases (GB-80), the government says that the loss figures were relevant to

30

Omidi's state of mind. The government does not explain why Omidi's denial that he ever directed SCM employees to file false claims is rendered any less probable simply because the employees filed $100 in false claims rather than $10. The question remains: Did Omidi order others to commit the scheme to defraud? The *size* of the putative scheme (whether "widespread" or otherwise (GB-78)), is, at best, of peripheral relevance, even if correctly calculated by the expert. The astronomical "loss" figures Petron endorsed were highly prejudicial and bled into every count in the case.

### C.    The Oxman Threats Were Inadmissible.

Among the most devastating "proofs" against Omidi were threats he supposedly made to three of the government's witnesses: Klasky (to whom Omidi had supposedly made the "gun-to-the-head" death threat); Palacios (whose false grand jury testimony Omidi had supposedly suborned and whose trial testimony Omidi had supposedly tried to suborn); and Twersky (whom Omidi supposedly threatened to sue unless he supported Omidi's account of the facts). The catch, of course, is that Omidi did not himself utter *any* of those threats; Oxman did. But on the premise that Oxman was Omidi's "agent" when Oxman made the statements, the district court admitted all the threats as evidence against Omidi.[14]

---

[14] The Oxman threats were both *irrelevant* and *hearsay* as to Omidi, unless Oxman was shown to be Omidi's agent. AB-63-64. The government expressly addresses

31

The government acknowledges that, to carry its burden under Fed. R. Evid. 104(b), it was "required to *introduce proof* sufficient to support a finding that Oxman served as Omidi's agent." GB-89-90 (emphasis added). Yet, much of the "proof" the government's brief itemizes was *never introduced* at trial. Rather, as the government concedes, some of the ostensible agency evidence was submitted "[l]ong before trial" and never presented to the jury. GB-85. Rule 104(b) flatly forbids reliance on materials that are never "introduce[d]." *See Huddleston v. United States*, 485 U.S. 681, 690 (1988) ("in assessing the sufficiency of the evidence under Rule 104(b), the trial court must consider all evidence *presented to the jury*" (emphasis added)).[15]

---

only the hearsay objection, but both issues ultimately turn on whether the government proved agency. It didn't.

[15] Even if all this pretrial "evidence" were cognizable, it would not remotely suggest an agreement that Oxman would serve as Omidi's agent or employee. The government omits that in the very same government motion papers from which it derives this pretrial "evidence," the prosecutors largely disavowed both the claim that Oxman was serving as Omidi's lawyer after he was disbarred (CR 121, at 5-6), and cast serious doubt on the claim that Oxman was serving as Omidi's "litigation coordinator." CR 121, at 7 ("What, exactly, a 'litigation coordinator' does is not clear to the government."). Indeed, said the government, Oxman "appears to cast his role as that of an agent for the attorneys, rather than the clients," and in all events "the government is not aware of exactly which individuals and entities [Oxman] was employed by, either as an attorney or as a 'litigation coordinator,' at any given time or the precise employment relationship." CR 121, at 7-8.

32

The government also invokes some evidence that was admitted only *after* the district court had already made its agency finding. We recognize that a district court may choose to admit Rule 104(b) evidence "conditionally"; in that event, the district court reserves its final ruling until it hears additional evidence bearing on the question of agency. Had the district court done so here, the defense would have had further opportunities to offer evidence undercutting any basis for treating Oxman as Omidi's agent. The defense would also have had an incentive to cross-examine Twersky and Palacios on their factual bases, if any, for regarding Oxman as an agent (assuming they even did).

But the district court chose, instead, to find Oxman to be Omidi's agent, full stop, the very first time the issue arose at trial: when the Klasky "gun-to-the-head" testimony was first presented. 30-ER-6045-50. When the government thereafter offered the Palacios and Twersky threats, the district court admitted them with no further ruling on the agency issue. 36-ER-7110; 43-ER-8627-29.

So the question presented is whether, at the point the court below made the agency finding, there was sufficient evidence of the "essential ingredient" of agency—"the extent of control exercised by the employer." *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010). As this Court explained in *Bonds*, "an agency relationship exists only if both the provider and the recipient have

33

manifested assent that the provider will act subject to the recipient's control and instruction." *Id.* at 507.

Not a speck of such evidence lay before the district court when it made its agency finding. There were, instead, only the following three paltry bits of evidence: (1) Klasky had seen Omidi and Oxman leave a building together shortly before Oxman made the death threat (30-ER-6044); (2) Oxman "at one time" had been a lawyer (30-ER-6044-45); and (3) Oxman and Omidi had "work[ed] closely" together when Klasky served at SCM (30-ER-6045). None of those facts, alone or together, suggests that Oxman and Omidi agreed that Oxman would be subject to Omidi's "control and instruction." *Bonds*, 608 F.3d at 507.

That leaves the government with its usual last refuge: harmless error. The government asserts that the witness threats consumed but "a small part" of a three-month trial. GB-92-93. That looks at the evidence through the wrong end of the telescope. To carry its harmless error burden, the government cannot engage in simple nose-counting. For an evidentiary error such as this, reversal is required "unless it is more probable than not that the error did not materially affect the verdict." *United States v. Bailey*, 696 F.3d 794, 803 (9th Cir. 2012).

The evidence at issue was about as lethal as it gets. Omidi was falsely accused of tampering with three crucial government witnesses. These accusations tarred Omidi with serious (and uncharged) felonies. That is explosive proof in any

34

criminal case, but especially where, as here, there was no sufficient foundation to attribute the threats to Omidi. *See United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986) (district court correctly sustained objection to prosecutor's suggestion that defendant's relative was threatening witness where there was "no evidence" defendant was involved with threat); *United States v. Morgan*, 786 F.3d 227, 232-34 (2d Cir. 2015) (reversing conviction following improper admission of death threat evidence where threat was not offense charged); *Dudley v. Duckworth*, 854 F.2d 967, 970 (7th Cir. 1988) (evidence of threat was "evidential harpoon"). And although the government downplays its use of the Oxman threats as "brief references" in an "hours-long summation" (GB-93), the record shows otherwise. In its opening summation, the government went through every jot and tittle of Oxman's three threats, urging the jury to infer that "Julian Omidi acts as a puppet master behind the scenes." 49-ER-9746-48.

The government then doubled down in rebuttal. It went through all the Oxman threats again, this time in ever more granular detail. 50-ER-10015-17. Based on the threats attributed to Omidi, the government argued that he must have had the requisite knowledge and intent. 50-ER-10018. The Oxman threat evidence was plainly inadmissible and utterly devastating to the defense.

35

## IV. THE FORFEITURE AND RESTITUTION AWARDS SHOULD BE REVERSED.

### A. The District Court Erred in Awarding Forfeiture.

The government faced a daunting challenge when it came to forfeiture. By its own admission, large swaths of SCM's business were untouched by the alleged fraud. *See* 3-ER-756, 779; 53-ER-10640, ¶ 261. And an enormous portion of SCM's funds were earned years before the alleged fraud. 47-ER-9374-75; 54-ER-10797-98, ¶¶ 4-6, 8. The government could have elected to show *which* portion of the funds were direct or indirect proceeds of the offenses. But doing so would have required a tracing analysis, which the government declined to pursue.

So, the government swung for the fences instead. It elected to forfeit every penny of SCM's $98,280,221.44 in revenue in five Omidi and SCM-controlled bank accounts. That was a tall order. To justify that haul, the government was required to show, under Fed. R. Crim. P. 32.2(b)(1)(A), that Appellants would not have obtained *any* of the $98,280,221.44 *but for* the charged offense, 3-ER-749.

The government contends, based entirely on out-of-circuit cases, that it satisfied that standard by showing that SCM's *entire* business was "permeated by fraud." GB-96-97. But this Court has rejected "permeated with fraud" as an available rationale outside the ambit of probable cause for search and seizure. In *United States v. Rutgard*, this Court stated that while "[a] finding of 'permeated with fraud' is sufficient to establish probable cause in the non-adversary context of

36

an application for a search warrant," that "conclusory phrase" is "too loose and indefinite a term to *sustain a criminal conviction* … or to constitute a finding by the preponderance of the evidence absent specific supporting evidence."  116 F.3d 1270, 1290 (9th Cir. 1997) (emphasis added).

Instead, to obtain wholesale forfeiture, the government had to show "*100 percent* of [SCM]'s medical practice was fraudulent," *id.* at 1289 (emphasis added), but it fell woefully short of proving that.  The district court held otherwise, but only by concocting the "call center" theory.  Although SCM had earned proceeds "from nonfraudulent proceedings between 2010 and 2013" (1-ER-23), the district court reasoned that even the patients with legitimate claims "were recruited through the call center as part of the overall fraudulent billing scheme." Because every patient (supposedly) came to SCM through the call center, every dollar of claims paid must therefore be deemed forfeitable. 1-ER-23.

The "call center" theory is flawed at every turn.  First and foremost, it ignores 18 U.S.C. § 981(a)(2)(A), which limits forfeitable funds to those obtained "as the result of the commission *of the offense giving rise to forfeiture*" (emphasis added).  Appellants were neither charged nor convicted of a "call center" fraud. Indeed, the indictment did not even mention the call center.  AB-71.

Nor was there any evidence that the call center itself was fraudulent.  The government states that "Get Thin employees, via the call center, collected patients'

37

basic health and insurance information and then categorized them by profitability."
GB-98. But there is nothing fraudulent about collecting health and insurance
information; every doctor's office does that. The government then points to
conduct that occurred *after* intake at the call center, such as the fact that patients
"were scheduled for 'pre-op' appointments by non-medical personnel donning lab
coats." GB-98. It isn't clear what kind of crime the "lab coat conspiracy" might
be, but it certainly does not support the government's hypothesis that the "call
center" was a fraud that poisoned everything else at SCM.[16]

To the contrary, it is undisputed that substantial portions of SCM's practice
were legitimate. The government expressly concedes—and the district court
found—that not every patient was "fraudulently diagnosed with sleep apnea." 3-
ER-779. Moreover, as the district court found, bariatric surgeons conducted
independent medical examinations of patients before performing Lap-Band
surgeries. 1-ER-19. Thus, some significant portion (and perhaps all) of the Lap-
Band surgeries were medically necessary.[17] Finally, multiple witnesses testified

---

[16] Nor did the government prove that proceeds from legitimate services "would not
have been generated absent the antecedent fraudulent call center." GB-102. SCM
had been operating for *four years* before the alleged scheme started and generated
more than $100 million in the two years before the scheme commenced. AB-76.

[17] Indeed, sleep apnea was almost *never* listed as a primary diagnosis in claims
submitted to insurers. AB-75 n.17. Accordingly, a falsified sleep apnea diagnosis

38

about the honest work they performed.  *E.g.*, 12-ER-2496-2501 (Carriedo), 14-ER-

2991-97 (Tapia), 19-ER-3937 (Madan), 47-ER-9375-81 (Salazar). [18]

### B.     The District Court Erred in Ordering Appellants to Pay Restitution for Sleep Studies and CPAP Equipment.

Appellants' brief (at 77-84) established three independent respects in which

the district court erred when it ordered Appellants to pay $11,207,773.96 in

restitution.  Nothing in the government's brief undermines that showing. [19]

*First*, under the MVRA, restitution may be awarded only to an "identifiable

victim."  18 U.S.C. § 3663A(c)(1)(B).  A "victim" is a "person directly and

---

could not have been the "but for" cause of payment for Lap-Band surgery if it was never submitted to the insurer.

[18] The government claims that "[t]he evidence sufficiently demonstrated that defendant's business was permeated by fraud that could not have been executed without the call center."  GB-97.  But the only support the government cites for this sweeping assertion is *its own briefing*.  GB-97 (citing 3-ER-625-34, 652-61, 724-60).  The government presented no evidence that all patients even passed through the call center.  Finally, neither *United States v. Venturella*, 585 F.3d 1013, 1017 (7th Cir. 2009), nor *United States v. Lo*, 839 F.3d 777, 793-94 (9th Cir. 2016), which the government cites (GB-100), involved an effort to forfeit property that was not obtained through the execution of the charged scheme.

[19] The government asserts that this Court should review for abuse of discretion the district court's determination that the insurers are "victims" under the MVRA. GB-102.  Wrong.  The application of a statute is not a matter of judicial discretion, and this Court has consistently held that the legality of a restitution order, including the determination of whether an entity is a "victim," is reviewed de novo. *See United States v. De La Fuente*, 353 F.3d 766, 771-72 (9th Cir. 2003) (reviewing de novo "victim" determination under MVRA); *United States v. Pangelinan*, 656 F. App'x 382, 383 (9th Cir. 2016) (same).

proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). The eight insurers identified as "victims" in most cases served as plan administrators for self-insured employers that were the actual payers. AB-78. Accordingly, the *employers* are the victims, not the insurers. The government responds that when insurers act as plan administrators they are obligated to provide any recovered funds to the employers. GB-106. That is precisely Appellants' point—the employers suffered a loss (if anyone did), and therefore the employers are "victims," not the insurers. AB-78.

The government also suggests that 18 U.S.C. § 3663A(b)(1)(A) expands the definition of "victim" to include "someone designated by the owner." That provision does nothing of the sort—it simply states that a court may order a defendant to return property to an owner or its designee. *See id.* If Congress wished to expand the definition of victim in § 3663A(a)(2), it could have done so.

The government also cites inapposite cases where successors of victims were deemed "victims" under the MVRA. GB-107-108 & n.26. Here, by contrast, the insurers did not succeed to the rights of injured parties; they simply acted as collectors for the actual victims.

*Second*, the government failed to prove "actual loss" because it never offered the Plans. AB-79-81. "Actual losses" are determined by comparing "what actually happened with what would have happened if [the defendant] had acted

40

lawfully." *United States v. Bussell*, 414 F.3d 1048, 1061 (9th Cir. 2005). The

Plans determine coverage (*see supra* pp. 3-4; AB-20-24, 79-81), and without them,

the district court had no basis for determining whether a claim was covered absent

the alleged falsehoods. In response, the government simply parrots the district

court's reasoning that the insurers "did not differentiate" between their role as

insurers and plan administrators. GB-108. That non sequitur does not alter the

fact that the Plans determine coverage, 10-ER-2072-73, 2119-20; 14-ER-2853-54;

41-ER-8256, and the government has not proved "what would have happened" if

Appellants had acted lawfully. *See Bussell*, 414 F.3d at 1061.

     *Third*, the district court improperly awarded restitution for sleep studies and

CPAP equipment based on conduct that was, at worst, negligent and not criminal,

as the MVRA requires. AB-82-84. For example, the government alleged that

Appellants altered initial sleep study scores to (1) make it appear that a patient had

sleep apnea when they did not *or* (2) make sleep apnea seem more severe. For

patients in the second category, however, a second sleep study was medically

necessary to calibrate the patient's CPAP equipment (15-ER-3177), and therefore

restitution should not have been awarded for them.

     The district court nonetheless awarded restitution because of evidence that

those sleep studies "were not being properly administered." 1-ER-20. But

improper administration of a sleep study is not the "offense" charged or the

41

"criminal conduct" in the course of a fraud scheme. 18 U.S.C. § 3663A(a)(2). The government only responds that "insurers would not pay for medically unnecessary services." GB-109. But for patients suffering from sleep apnea, a follow-on sleep study to calibrate equipment *was* medically necessary. 15-ER-3177.

Similarly, the district court awarded restitution for CPAP equipment (even if it was used by patients with sleep apnea) because it was supposedly "not provided in accordance with generally accepted standards of medical care." 1-ER-21. This again falls short of the MVRA's standard. *See* 18 U.S.C. § 3663A(a)(2). The government argues that restitution is proper because prescriptions for CPAP machines were based on altered sleep studies. The government ignores that a portion of patients had sleep apnea even without alteration of their scores (54-ER-10651-52, ¶ 21); it is *their* CPAP equipment that should have been excluded from the restitution award. AB-82-83. The government also claims that restitution for CPAP equipment is improper because sleep studies were performed without examinations to determine their medical necessity. GB-109. The government ignores that Dr. Madan ordered the preoperative studies as medically necessary for all Lap-Band surgery candidates. 4-ER-894. Finally, the government tries to connect CPAP equipment to criminal wrongdoing by asserting that the equipment was not "prescribed at all" in the case of Dr. Zarrabi (GB-109), but it makes no effort to identify how many prescriptions were allegedly faked. This is especially

42

problematic given the multiple examples in the record of doctors who are not alleged to have participated in any illegal conduct prescribing CPAP equipment. *See, e.g.*, 28-ER-5688 (Drs. Taylor and Karaptyan); 45-ER-9023-24 (Dr. Popson).

## CONCLUSION

For the reasons stated, this Court should reverse the amended judgments and the money judgment of forfeiture.

Dated: May 28, 2024

FRIEDMAN KAPLAN SEILER
  ADELMAN & ROBBINS LLP

  s/ *Lawrence S. Robbins*
Lawrence S. Robbins
lrobbins@fklaw.com
Jeffrey C. Fourmaux
jfourmaux@fklaw.com
Priyanka Wityk
pwityk@fklaw.com
7 Times Square
New York, NY 10036
212-833-1100

*Attorneys for Defendant-Appellant*
*Julian Omidi*

Elon Berk
eberk@crimlawla.com
GUROVICH BERK & ASSOCIATES
15250 Ventura Boulevard, Suite 1220
Sherman Oaks, CA 91403
818-205-1555

*Attorneys for Defendant-Appellant*
*Surgery Center Management, LLC*

43

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**   23-1719, 23-1941, & 23-1959 (Con.)

I am the attorney or self-represented party.

**This brief contains**   9,995   **words,** including   0   words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).  The brief's type size and typeface comply with FRAP 32(a)(5), (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [  ] it is a joint brief submitted by separately represented parties.
  [  ] a party or parties are filing a single brief in response to multiple briefs.
  [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[X] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ *Lawrence S. Robbins*   **Date**   May 28, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

44